**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

*Attorneys for Plaintiff*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN LALONE, Derivatively on Behalf of Nominal Defendant BLOCK, INC., <br><br> Plaintiff, <br><br> v. <br><br> JACK DORSEY, ROELOF BOTHA, AMY BROOKS, SHAWN CARTER, PAUL DEIGHTON, RANDY GARUTTI, JAMES MCKELVEY, MARY MEEKER, ANNA PATTERSON, LAWRENCE SUMMERS, DAVID VINIAR, DARREN WALKER, and AMRITA AHUJA, <br><br> Defendants, <br> and <br><br> BLOCK, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Kevin LaLone ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Block, Inc. ("Block" or the "Company") against its Board of Directors (the "Board") and certain of its executive officers, seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of publicly available documents concerning Block, transcripts of conference calls with analysts, announcements concerning the Company, filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by, and regarding, Block, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      Plaintiff brings this stockholder derivative action on behalf of Block against the Individual Defendants for breaches of their fiduciary duties, violations of federal securities laws, and other wrongdoing committed between November 4, 2021 and April 4, 2022 (the "Relevant Period") in connection with, among other things, Block's January 31, 2022 acquisition and stock-for-stock merger (the "Acquisition") with Afterpay Limited ("Afterpay").

2.      Block, formerly known as Square Inc., is a technology company that creates financial service tools. Its segments include Square, which offers financial tools for sellers, and Cash App, which provides financial tools for individuals.

3.      Cash App acquires and maintains extremely sensitive Personal Identifying Information ("PII") for each of its users. The security of Cash App's customers' inherently valuable PII is exceedingly important. The Company is responsible for designing, developing, and maintaining security measures, safely securing each user's PII, and actively monitoring third party infiltration.

4.     On January 31, 2022, Block completed its Acquisition of Afterpay, then an Australian limited company listed on the Australian Stock Exchange, pursuant to an arrangement under Australia's Corporations Act 2001 (the "Scheme"). Pursuant to the financial terms of the Scheme, Block acquired all outstanding ordinary shares of Afterpay in exchange for 0.375 of a share of newly issued SQ class A common stock or corresponding SQ CDI.

5.     As a material term of the Acquisition, Block and the Individual Defendants promised Afterpay's shareholders in a definitive proxy statement filed with the SEC on Schedule 14A on October 27, 2021:

> No offer of securities shall be made in the United States absent registration under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or pursuant to an exemption from, or in a transaction not subject to, such registration requirements. ***The Square securities issued in the proposed transaction are anticipated to be issued in reliance upon an available exemption from such registration requirements pursuant to Section 3(a)(10) of the Securities Act.***

(Emphasis added).

6.     On or around January 31, 2022, in connection with the Acquisition, Block offered and sold approximately 113 million unregistered Block shares directly to former Afterpay shareholders. In a Form 8-K filed with the SEC that day, the Company stated:

> On January 31, 2022 (Pacific Standard Time)/February 1, 2022 (Australian Eastern Daylight Time), Block completed its previously announced acquisition of all ordinary shares of Afterpay Limited, an Australian public company limited by shares and listed on the Australian Securities Exchange ("Afterpay" and such shares, "Afterpay Shares"), pursuant to a court-approved scheme of arrangement under Part 5.1 of Australia's Corporations Act 2001 (Cth) (the "Scheme" and such acquisition, the "Transaction"), as contemplated by the Scheme Implementation Deed (the "Deed"), dated as of August 1, 2021 (Pacific Daylight Time)/August 2, 2021 (Australian Eastern Standard Time) (as amended by the Amending Deed, dated as of December 6, 2021 (Pacific Standard Time) / December 7, 2021 (Australian Eastern Daylight Time)), by and among Block, Afterpay and Lanai (AU) 2 Pty Ltd, an Australian proprietary company limited by shares and an indirect wholly owned subsidiary of Block ("Block Acquirer").
>
> Upon the implementation of the Scheme, all Afterpay Shares issued and outstanding as of 12:00 a.m. on January 21, 2022 (Pacific Standard Time) / 7:00 p.m. on January 21, 2022 (Australian Eastern Daylight Time), the record date for the Scheme, were transferred to Block Acquirer, and the holders of such Afterpay

Shares ("Scheme Participants") became entitled to receive, for each such share, either (a) where such Scheme Participant was a Share Elected Shareholder (as defined in the Deed), 0.375 shares of Block's Class A common stock ("New Block Shares"); or (b) where such Scheme Participant was a CDI Elected Shareholder (as defined in the Deed), 0.375 CHESS Depositary Interests, each representing an ownership interest in a share of Block Class A common stock ("New Block CDIs"). In connection with the Transaction, 113,387,895 New Block Shares (including shares underlying 95,377,954 New Block CDIs) were issued to or for the benefit of Scheme Participants.

7.      Contrary to the representations in the January 31, 2022 8-K, Block did not satisfy the mandatory conditions necessary to exempt it from registration under § 3(a)(10) and permit the issuance and sale of unregistered Block shares. In violation of §§ 5(a) and (c) of the Securities Act of 1933 ("1933 Act" or "Securities Act"), no registration statement has been filed with the SEC or been in effect with respect to these Block shares issued, solicited, and sold by means of the Acquisition.

8.      In furtherance of the Acquisition, on December 17, 2021, Block notified its shareholders that a supposed "fairness" hearing had been conducted before the Supreme Court of New South Wales (the "NSW Court"), which had approved the Scheme. However, unbeknownst to the NSW Court itself, representations from Defendants, and corresponding submissions, were materially false and misleading and omitted material information critical to any genuine assessment of the Acquisition's fairness.

9.      For instance, during the Relevant Period, the Individual Defendants failed to implement and monitor reasonable and appropriate internal controls over customers' PII and ignored red flags signaling Cash App's security vulnerabilities dating back to at least 2020. The Individual Defendants failed to follow basic industry cybersecurity standards despite knowing the value of customers' private information and the risks associated with unauthorized individuals obtaining access to it. The Individual Defendants breached their fiduciary duties to Block by failing to employ acceptable data and cybersecurity standards in compliance with federal regulations.

10.      As a result of the inadequate security measures, on December 10, 2021, one week prior to the NSW Court's fairness hearing, the Company suffered a major data breach (the "Data

Breach") when a former employee obtained access to the full names and brokerage account numbers, brokerage portfolio values, brokerage portfolio holdings, and stock trading activities of over eight million of the Company's customers, potentially compromising these customers' PII.

11.     The Individual Defendants further breached their fiduciary duties by personally making and/or causing Block to make to the investing public a series of materially false and misleading statements and omissions about Block's efforts to protect its customers' PII. Specifically, the Individual Defendants failed to disclose to investors that: (i) the Company lacked adequate protocols restricting access to sensitive customer information; (ii) as a result, a former employee was able to download certain Cash App reports containing full customer names and brokerage account numbers, as well as brokerage portfolio value, brokerage portfolio holdings and/or stock trading activity in the Data Breach; (iii) as a result, the Company was reasonably likely to suffer significant damage, including reputational harm; and (iv) as a result of the foregoing, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

12.     The Individual Defendants caused additional damage to Block by causing it to repurchase more than a million shares of its own stock at artificially inflated prices between November 1, 2021 and March 31, 2022, costing the Company $196.3 million.

13.     On April 4, 2022, Block filed a Form 8-K with the SEC announcing the Data Breach that effected as many as 8.2 million Cash App customers. Despite having been aware of the Data Breach since shortly after it occurred, Block offered no explanation as to why the Company had let bad actors have a nearly four-month head start before disclosing the issue to consumers who needed to protect their PII.

14.     On this news, the Company's stock fell $9.27, or 6.4%, to close at $135.92 per share on April 5, 2022.

15.     On November 2, 2022, a consumer class action was filed in the United States District Court for the Northern District of California against the Company and Cash App,

captioned *Gordon v. Block, Inc.*, Case No. 3:22-cv-06787-JSC (N.D. Cal.) (the "Consumer Class Action"), alleging negligence, violations of California and Texas consumer protection laws, fraud by omission, violation of Cal. Civ. Code § 1710 (deceit by concealment), breach of implied contract, breach of confidence, invasion of privacy, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing and seeking equitable relief.

16.     On January 31, 2023, a securities class action was filed in this Court against the Company; Defendant Jack Dorsey ("Dorsey"), Block's co-founder, "Block Head," and Chairperson; Defendant Amrita Ahuja ("Ahuja"), the Company's Chief Financial Officer ("CFO"); and Anthony Eisen ("Eisen"), the Co-Chief Executive Officer ("CEO") and co-founder of Afterpay, captioned *Hart v. Block, Inc.*, Case No. 3:23-cv-00455-TLT (N.D. Cal.) (the "Securities Action"), seeking damages on behalf of a class of stockholders who purchased Block shares during the Relevant Period and former shareholders of Afterpay securities who acquired unregistered Block shares pursuant to the Acquisition. The Securities Action asserts non-fraud, strict liability claims under §§ 12(a)(1), 12(a)(2), and 15 of the Securities Act against Block and certain current and former Block and Afterpay officers and directors, as well as scheme liability claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act").

17.     In addition to the costs and expenses related to defending itself against the Consumer Class Action and the Securities Action and exposing Block to potential liability for class-wide damages, the Individual Defendants' misconduct has subjected the Company to costs incurred in connection with wasting of corporate assets and enabled the Individual Defendants, who were improperly overcompensated by the Company, to unjustly enrich themselves.

18.     Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action, Block will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, as well as Sections 12 and 15 of the Securities Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Nominal Defendant Block and the Individual Defendants conduct business in this District and the conduct at issue took place and had an effect in this district.

**PARTIES**

*Plaintiff*

24.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Block.

*Nominal Defendant*

25.     Nominal Defendant Block is incorporated under the laws of Delaware and "do[es] not designate a headquarters location as [it has] adopted a distributed work model." At the time of the Acquisition, Block was headquartered in San Francisco, California. Block's shares trade on the New York Stock Exchange under the symbol "SQ."

*Individual Defendants*

26.     Defendant Dorsey is the co-founder of Block and has served as the principal executive officer and as director since July 2009. Dorsey served as Block's CEO and President

from July 2009 until April 2022 when he became Block Head and Chairperson of the Board. As of March 31, 2022, Dorsey owned 48,844,566 Class B Block shares, with more than 43% of the Company's voting control. Defendant Dorsey is named as a defendant in the Securities Action.

27.     Defendant Roelof Botha ("Botha") has served as a member of the Board since 2011. He is the lead independent director, and he serves on the Audit and Risk Committee and the Compensation Committee. As of March 31, 2022, Botha owned 711,719 Class A Block shares. According to the Company's public filings, Botha received $304,729 in compensation from the Company in 2021.

28.     Defendant Amy Brooks ("Brooks") has served as a member of the Board since 2019 and serves on the Nominating and Corporate Governance Committee. As of March 31, 2022, Brooks owned 6,236 Class A Block shares. According to the Company's public filings, Brooks received $291,943 in compensation from the Company in 2021.

29.     Defendant Shawn Carter ("Carter") has served as a member of the Board since 2021. Carter is a founder and shareholder of, and an artist at, TIDAL, a global music and entertainment platform, which is currently majority owned by Block. As of March 31, 2022, Carter owned 31,607 Class A Block shares. According to the Company's public filings, Carter received $286,527 in compensation from the Company in 2021.

30.     Defendant Paul Deighton ("Deighton") has served as a member of the Board since 2016 and serves on the Compensation Committee. As of March 31, 2022, Deighton owned 30,185 Class A Block shares. According to the Company's public filings, Deighton received $303,009 in compensation from the Company in 2021.

31.     Defendant Randy Garutti ("Garutti") has served as a member of the Board since 2017 and serves on the Nominating and Corporate Governance Committee. As of March 31, 2022, Garutti owned 18,601 Class A Block shares. According to the Company's public filings, Garutti received $299,842 in compensation from the Company in 2021.

32.     Defendant James McKelvey ("McKelvey") has served as a member of the Board

since 2009. As of March 31, 2022, McKelvey owned 125,061 Class A Block shares. According to the Company's public filings, McKelvey received $289,619 in compensation from the Company in 2021.

33. Defendant Mary Meeker ("Meeker") has served as a member of the Board since 2011 and serves on the Compensation Committee. As of March 31, 2022, Meeker owned 406,250 Class A Block shares. According to the Company's public filings, Meeker received $304,729 in compensation from the Company in 2021.

34. Defendant Anna Patterson ("Patterson") has served as a member of the Board since 2017. In 2021, Patterson served on the Audit and Risk Committee. As of March 31, 2022, Patterson owned 13,571 Class A Block shares. According to the Company's public filings, Patterson received $302,565 in compensation from the Company in 2021.

35. Defendant Lawrence Summers ("Summers") has served as a member of the Board since 2011 and serves on the Audit and Risk Committee. As of March 31, 2022, Summers owned 20,559 Class A Block shares. According to the Company's public filings, Summers received $299,842 in compensation from the Company in 2021.

36. Defendant David Viniar ("Viniar") has served as a member of the Board since 2013. In 2021, Viniar served on the Nominating and Corporate Governance Committee and the Audit and Risk Committee. As of March 31, 2022, Viniar owned 72,066 Class A Block shares. According to the Company's public filings, Viniar received $382,102 in compensation from the Company in 2021.

37. Defendant Darren Walker ("Walker") has served as a member of the Board since 2020 and serves on the Nominating and Corporate Governance Committee. As of March 31, 2022, Walker owned 2,968 Class A Block shares. According to the Company's public filings, Walker received $295,131 in compensation from the Company in 2021.

38. Defendant Ahuja has served as Block's CFO since 2019. As of March 31, 2022, Ahuja owned 122,752 Class A Block shares. According to the Company's public filings, Ahuja

received $10,235,667 in compensation from the Company in 2021. Notably, Defendant Ahuja sold Block shares during the Relevant Period at inflated prices for combined total proceeds in excess of $1,152,949, including a sale of 2,680 shares on April 4, 2022, the day the Data Breach was disclosed, for proceeds of $380,000. Defendant Ahuja is named as a defendant in the Securities Action.

39.    Defendants referenced in paragraphs 26 through 38 are herein referred to as the "Individual Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

40.    By reason of their positions as officers and/or directors of Block, and because of their ability to control the business and corporate affairs of Block, the Individual Defendants owed Block and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Block in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Block and its shareholders so as to benefit all shareholders equally.

41.    Each director and officer of the Company owes to Block and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

42.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Block, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

43.    To discharge their duties, the officers and directors of Block were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Block, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the New York Stock Exchange, the Individual Defendants had a fiduciary duty to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and materially misleading information regarding the Company's business, prospects, and operations. The Individual Defendants also had a fiduciary duty to disclose the material information necessary to prevent other public statements, including those in its regulatory filings with the SEC, from being materially false and, so that the market price of the Company's common stock was based upon truthful, accurate, and fairly presented information.

46.     To discharge their duties, the officers and directors of Block were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Block were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to Block's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Block conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Block and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Block's operations would comply with all applicable laws and Block's public statements, financial statements and regulatory filings were accurate;

(f)     adequately monitor the Company's officers and employees to ensure that their public statements about the Company were complete and accurate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

47.     Each of the Individual Defendants further owed Block and its shareholders the duty of loyalty requiring that they favor the interest of Block and its shareholders over their own while conducting the affairs of the Company, and that the Individual Defendants refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

48.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Block and were at all times acting within the course and scope of such agency.

49.     Because of their advisory, executive, managerial, and directorial positions with Block, each of the Individual Defendants had access to adverse, non-public information about the Company.

50.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Block.

**BLOCK'S CODE OF BUSINESS CONDUCT AND ETHICS**

51.     Block's Code of Conduct applies to all directors, officers and employees and is designed to guide employees in approaching their work "lawfully, honestly, ethically, and in the best interest of Block, Inc."

52.     The Code of Conduct begins with a message from Dorsey, stating, among other things, that "[t]he Code is our framework for keeping our workplace inclusive, respectful, and compliant."

53.     In a section titled "Security and Privacy," the Code of Conduct states, among other things:

> You have a shared duty to protect Block's intellectual property, [material nonpublic information ("MNPI")], personally identifiable information, other data described in go/datapolicy (collectively, "Block Data") and other business assets. We take our intellectual property, Block Data, business systems, and network security very seriously. Good security, working practices, and procedures for Block property, in all its forms, are critical in protecting Block Data and intellectual property development that fuels Block's growth, the livelihood of employees, and our collective investment in Block. Block's files, networks, software, internet access, internet browser programs, email, voice mail, and other business equipment and resources are provided for business use, and they are the exclusive property of Block. Misuse of such property is not tolerated. We reserve the right to monitor your use of Block systems (including email and Slack communications) and access to Block data to secure our systems, monitor compliance with this Code and other Block policies, and protect our rights and the rights of our customers.

> *          *          *

> In addition, you should make every reasonable attempt to prevent your Block-issued equipment from becoming damaged or a security vulnerability for Block[.]

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
-13-

54.     With respect to the Company's "Insider Trading Policy," the Code of Conduct states, in relevant part:

> You may not trade or enable others to trade Block stock or stock of another company, such as a customer, supplier, competitor, potential acquisition target or alliance, while in possession of MNPI about that company. Insider trading not only violates this Code, it also violates the law and can result in criminal consequences.

55.     In a section titled "Financial Integrity and Accurate Records," the Code of Conduct states, among other things, that "[a]ccurate, clear and complete records are essential to making the best business decisions, preserving our reputation for financial integrity and meeting our obligations as a public company. In parallel, our shareholders and the financial markets rely on our full, fair, truthful, timely and understandable disclosures and financial information[.]"

## BLOCK'S AUDIT AND RISK COMMITTEE CHARTER

56.     Block's Audit and Risk Committee Charter, adopted November 4, 2015, states that the purpose of the Audit and Risk Committee is to assist the Board in overseeing:

- The Company's accounting and financial reporting processes and internal controls as well as the auditing and integrity of the Company's financial statements.
- The qualifications and independence of the Company's independent registered public accounting firm (the "Independent Auditor").
- The performance of the Company's Independent Auditor and internal audit function.
- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).
- Risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.

57.     In a section titled "Internal Controls," the Audit and Risk Committee Charter states, among other things, "The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the adequacy and effectiveness of the Company's internal controls[.]"

58.     In a section titled "Disclosure Controls and Procedures," the Audit and Risk Committee Charter states that "[t]he Audit and Risk Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures."

59.     With respect to "Legal and Regulatory Compliance," the Audit and Risk Committee Charter states, among other things:

> The Audit and Risk Committee shall oversee the review of any complaints and submissions that have been brought to the Audit and Risk Committee by the Company's Chief Legal Officer under the Company's Code of Business Conduct and Ethics (the "Code"). The Audit and Risk Committee shall review and discuss with management and the Independent Auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including compliance with the Foreign Corrupt Practices Act and foreign anti-corruption laws, and compliance with export control regulations, (ii) any reports received through the Company's reporting hotline and (iii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters. The Audit and Risk Committee shall discuss with management and the Independent Auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to employ inadequate internal controls, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

63.     Each of the Individual Defendants aided, abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Block and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### Background

65.     Established in 2013 by parent company Square, Inc., Cash App was one of the first peer-to-peer payment apps in the financial technology industry. Peer-to-peer payment services allow consumers to use their smartphones to transfer money to individuals and businesses. In recent years, Cash App has expanded its services beyond peer-to-peer payments. Cash App users can now also receive direct deposit payments, purchase cryptocurrency, and invest through the app's investment feature.

66.     When Cash App users create an account, they are prompted and required to provide

several forms of PII. As a result, the Company collects and stores a massive amount of its customers' PII, including financial information and other personally identifiable data. The Company has obligations created by industry standards, common law, and representations made to its users to keep PII confidential and protect it from unauthorized access and disclosure.

67.     For example, Block's "Privacy Notice," published on its website, describes how the Company and its affiliates, such as Cash App, collect, use, disclose, transfer, store, retain, or otherwise process customer PII. The Privacy Notice provides:

> We take reasonable measures, including administrative, technical, and physical safeguards, to protect your information from loss, theft, and misuse, and unauthorized access, disclosure, alteration, and destruction.[1]

68.     But the Company and the Individual Defendants failed to take reasonable measures to safeguard this valuable PII. Among other things, Defendants failed to implement data security measures designed to prevent the release of information to former employees. As a result, customers' PII was compromised through unauthorized access.

69.     On April 4, 2022, Block announced the Data Breach and explained that a former employee had improperly downloaded certain reports of the Company's subsidiary, Cash App Investing, on December 10, 2021. The information in the reports included full customer names and brokerage account numbers, as well as brokerage portfolio value, brokerage portfolio holdings, and/or stock trading activity. As many as 8.2 million Cash App customers were affected. Specifically, the Company's Form 8-K (the "April 2022 8-K"), filed with the SEC, stated, in relevant part:

> On April 4, 2022, Block, Inc. (the "Company") announced that it recently determined that a former employee downloaded certain reports of its subsidiary Cash App Investing LLC ("Cash App Investing") on December 10, 2021 that contained some U.S. customer information. While this employee had regular access to these reports as part of their past job responsibilities, in this instance these ***reports were accessed without permission after their employment ended***.
>
> The information in the reports ***included full name and brokerage account number***

---

[1] *See* Privacy Notice, https://cash.app/legal/us/en-us/privacy (last accessed February 17, 2023).

(this is the unique identification number associated with a customer's stock activity on Cash App Investing), and for some customers also included brokerage portfolio value, brokerage portfolio holdings and/or stock trading activity for one trading day.

The reports did not include usernames or passwords, Social Security numbers, date of birth, payment card information, addresses, bank account information, or any other personally identifiable information. They also did not include any security code, access code, or password used to access Cash App accounts. Other Cash App products and features (other than stock activity) and customers outside of the United States were not impacted.

Upon discovery, the Company and its outside counsel launched an investigation with the help of a leading forensics firm. Cash App Investing is contacting *approximately 8.2 million current and former customers* to provide them with information about this incident and sharing resources with them to answer their questions. The Company is also notifying the applicable regulatory authorities and has notified law enforcement.

The Company takes the security of information belonging to its customers very seriously and continues to review and strengthen administrative and technical safeguards to protect the information of its customers. Future costs associated with this incident are difficult to predict. Although the Company has not yet completed its investigation of the incident, based on its preliminary assessment and on the information currently known, the Company does not currently believe the incident will have a material impact on its business, operations, or financial results.

(Emphasis added).

70.     This notice was issued nearly *four months* after the Data Breach had allegedly occurred, and Block offered no explanation as to why it had let bad actors have such a valuable head start on consumers who needed to protect their PII. This caused unnecessary damage and harm to consumers including through fraudulent charges, lost time, and harm to their credit.

71.     In addition to being inexplicably late, the April 2022 8-K failed to provide basic details including how the former employee accessed the PII, why a former employee had access to the Company's networks, whether the PII was encrypted or protected in any way to keep bad actors from using it, or how the Data Breach was discovered. The Company also failed to offer any credit or identity theft monitoring services to affected consumers.

/ / /

/ / /

1

*The Individual Defendants Ignored Serious Signs of Data Vulnerability and Failed to Adhere to Federal and State Guidelines Concerning Data Security*

2

3      72.      The Company was aware of the inadequacies of Cash App's security prior to the

4   Data Breach. Since as early as 2020, Defendants had been repeatedly put on notice that the

5   Company's security measures were dangerously insufficient, leaving users' PII at risk of theft.

6   Rather than addressing the problems by upgrading its security procedures, screening, systems, and

7   protocols, Defendants chose to allow customers' PII to remain potentially exposed to bad actors.

8   Defendants' negligence and failure to heed myriad warnings about its deficient data security, even

9   after multiple hacking instances, has shown Defendants' active concealment of the security

    inadequacy.

10      73.      An article published in March 2021 by *Yahoo Finance* stated that at least six users

11   were harmed by Cash App's vulnerability to hackers. In each of these instances, hackers accessed

12   and drained cash, stock, and bitcoin out of accounts linked to Cash App.[2] According to the article,

13   between August 2020 and September 2020, California business owner, Britt Soderberg, stated

14   hackers generated numerous false refunds in Cash App, resulting in a loss of approximately

15   $21,000.00. In another attack, a Cash App user by the name of Shania Jensen alleged that one

16   morning she woke up to find that nearly $3,000.00 was drained from her account. In another

17   example, an individual, who chose to remain anonymous, alleged approximately $1,850.00 was

18   taken out of his Cash App-linked bank account after he received what appeared to be a message

19   with Cash App's official domain, stating there had been a fraudulent attempt to log into his

20   account. The user followed a link connecting him to his account and double-checked his security

21   settings. Despite this, the hackers began a series of cash withdrawals; he received no notifications

22   from Cash App regarding any transactions. Each of these users claim they attempted to notify Cash

23   App.

24      74.      With increasing frustration surrounding Cash App's vulnerability from its users,

25

26   [2] Alexis Keenan, *Square's Cash App vulnerable to hackers, customers claim: 'They're completely ghosting you*, YAHOO FINANCE (Feb. 17, 2023), https://www.yahoo.com/lifestyle/squares-cash-

27   app-vulnerable-to-hackers-customers-claim-113556593.html (last accessed February 17, 2023).

28

Cash App has seen a surge in complaints. According to the *Yahoo Finance* article, between February 2020 and March 2021, the Better Business Bureau investigated 2,485 complaints concerning Cash App. The Company's competitors, meanwhile, received far fewer complaints. Venmo, for example, received only 928 complaints while Zelle received a mere 83 complaints during the same timeframe.

75.     Also, according to the *Yahoo Finance* article, user reviews of Cash App mentioning the words "fraud" or "scam" increased by 335% between February 2020 and February 2021.

76.     The Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, prohibits "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC"), which enforces the FTCA, renders a company's failure to maintain reasonable and appropriate data security over customers' PII an "unfair practice."

77.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to a June 2015 FTC guide titled "Start with Security," the need for data security should be factored into all business decision-making.

78.     The "Start with Security" guide further recommends that companies not maintain PII longer than is needed to authorize a transaction, limit access to PII, require complex passwords on networks, and verify that third-party service providers have implemented reasonable security measures.

79.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

80.     The FTC has long recognized that consumer data is a new and valuable form of

currency. In a 2009 FTC roundtable presentation, then-Commissioner Pamela Jones Harbour underscored this point, stating:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

81.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.     California law requires a business to disclose a security breach to any California resident whose unencrypted personal information "was, or is reasonably believed to have been, acquired by an unauthorized person." California Civ. Code § 1798.82(a). If more than 500 California residents are impacted by the data breach, the company must notify the California Attorney General's Office and electronically submit to the Attorney General a copy of the notice. California Civ. Code § 1798.82(f). The California Consumer Privacy Act of 2018 (the "CCPA") gives consumers additional rights regarding data security, including the right to know what personal information is retained by a company and how it is being used. Consumers must also be able to obtain and delete their own PII at any time.

83.     Similarly, Delaware law requires persons conducting business in the state to "implement and maintain reasonable procedures and practices to prevent the unauthorized acquisition, use, modification, disclosure, or destruction of personal information collected or maintained in the regular course of business." 6 *Del. C.* § 12B-100. The Delaware Attorney

---

[3] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed Feb. 20, 2023).

General must be notified if more than five hundred Delaware residents were affected in the breach.

84.     Despite being aware of the Company's previous security issues and the comprehensive federal and state laws and guidelines, as well as the potential liability imposed by the FTC for failing to meet data security obligations, the Individual Defendants failed to implement sufficient data protection policies, procedures, and controls and left Block's customers vulnerable to attacks.

***The False and Misleading Statements***

85.     On November 4, 2021, Block filed its Form 10-Q with the SEC for the period ended September 30, 2021 (the "2021 Q3 10-Q"). It noted, as one of the operational risks: "real or perceived security breaches or incidents or human error in administering our software, hardware, and systems." It also stated, in relevant part:

> ***Our products and services may not function as intended due to errors in our software, hardware, and systems, product defects, or due to security breaches or incidents or human error in administering these systems, which could materially and adversely affect our business.***
>
> Our software, hardware, systems, and processes may contain undetected errors or vulnerabilities that could have a material adverse effect on our business, particularly to the extent such errors or vulnerabilities are not detected and remedied quickly. . . . As our hardware and software services continue to increase in size and complexity, and as we integrate new, acquired subsidiaries with different technology stacks and practices, these risks may correspondingly increase as well.
>
> In addition, we provide frequent incremental releases of product and service updates and functional enhancements, which increase the possibility of errors. The products and services we provide are designed to process complex transactions and deliver reports and other information related to those transactions, all at high volumes and processing speeds. Any errors, data leaks, security breaches or incidents, disruptions in services, or other performance problems with our products or services caused by external or internal actors could hurt our reputation and damage our customers' businesses. Software and system errors, or human error, could delay or inhibit settlement of payments, result in oversettlement, cause reporting errors, or prevent us from collecting transaction-based fees, or negatively impact our ability to serve our customers, all of which have occurred in the past. Similarly, security breaches or incidents such as cyber-attacks or identity theft could disrupt the proper functioning of our software products or services, cause errors, allow loss or unavailability of, unauthorized access to, or disclosure of,

proprietary, confidential or otherwise sensitive information of ours or our customers, and other destructive outcomes. Moreover, security breaches or incidents or errors in our hardware or software design or manufacture could cause product safety issues typical of consumer electronics devices. Any of the foregoing issues could lead to product recalls and inventory shortages, result in costly and time-consuming efforts to redesign and redistribute our products, give rise to regulatory inquiries and investigations, and result in lawsuits and other liabilities and losses, which could have a material and adverse effect on our business.

Additionally, electronic payment, hardware, and software products and services, including ours, have been, and could continue to be in the future, specifically targeted and penetrated or disrupted by hackers and other malicious actors. Because the techniques used to obtain unauthorized access to data, products, and services and to disable, degrade, or sabotage them change frequently and may be difficult to detect or remediate for long periods of time, we and our customers may be unable to anticipate these techniques or implement adequate preventative measures to stop them. If we or our sellers or other customers are unable to anticipate or prevent these attacks, our sellers' or other customers may be harmed, our reputation could be damaged, and we could incur significant liability.

86.    On February 24, 2022, Block filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K's descriptions of Block's business and operations were substantially similar and contained the same false and misleading statements as listed above in the 2021 Q3 10-Q.

87.    On the same day, Block published a shareholder letter attached to a Form 8-K filed with the SEC. In that letter, the Company detailed highlights from the fourth quarter of 2021 but made no mention of the Data Breach.

88.    The statements identified above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

89.    Specifically, the Individual Defendants failed to disclose to investors that: (i) the Company lacked adequate protocols restricting access to customer sensitive information; (ii) as a result, a former employee was able to carry out the Data Breach, compromising consumers' PII including full customer names and brokerage account numbers, as well as brokerage portfolio value, brokerage portfolio holdings and/or stock trading activity; (iii) as a result, the Company was reasonably likely to suffer significant damage, including reputational harm; and (iv) as a result of

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
-23-

1   the foregoing, positive statements about the Company's business, operations, and prospects were

2   materially misleading and/or lacked a reasonable basis.

3   ***The Truth Emerges***

4         90.    On April 4, 2022, nearly *four months* after the security breach occurred, Block

5   issued the April 2022 8-K notifying affected customers and investors of the Data Breach.

6         91.    On this news, the price of Block's shares fell $9.27, or 6.4%, from $145.19 per

7   share at the close of trading on April 4, 2022 to close at $135.92 per share at the close of trading

8   on April 5, 2022.

9         92.    On April 11, 2022, Defendants Viniar and Patterson informed Block that they

10   would not stand for re-election at the annual meeting. Block revealed this information to the public

11   four days later when it filed a Form 8-K with the SEC on April 15, 2022. Although Block stated

12   that Defendants Viniar's and Patterson's decisions to leave the Board were "a result of wanting to

13   devote more time to other professional and personal activities," these departures occurred just one

14   week after the public disclosure of the Data Breach and Block's resulting stock drop.

15   ***The Unlawful Sale of Unregistered Securities***

16         93.    On August 1, 2021, Block (then still known as Square) announced that the boards

17   of directors of Block and Afterpay had reached agreement on the terms of a recommended

18   acquisition of Afterpay by Block. The financial terms of the Acquisition required Block to acquire

19   all of the outstanding ordinary shares of Afterpay in exchange for 0.375 shares of new Square

20   Shares. In a preliminary proxy statement filed with the SEC on Schedule 14A on September 23,

21   2021 (the "Preliminary Proxy"), the Company added:

22        Square and Afterpay are proposing to engage in a business combination under
     Australian corporate law, pursuant to which Square Sub will acquire all of the

23        outstanding ordinary shares of Afterpay, and Afterpay will thereby become a
     wholly owned subsidiary of Square Sub and an indirect wholly owned subsidiary

24        of Square. As set forth in the Transaction Agreement, the business combination will

25        be carried out in accordance with a scheme of arrangement under the Australian
     Corporations Act to be submitted for approval by Afterpay shareholders and the

26        Court.

27

28

Subject to the terms and conditions set forth in the Transaction Agreement, upon implementation of the Scheme, all outstanding Afterpay ordinary shares as of the Scheme Record Date will be transferred to Square Sub, and the holders of such Afterpay ordinary shares (other than Ineligible Foreign Shareholders, as described below under "The Transaction Agreement, Scheme and Deed Poll – Ineligible Foreign Shareholders") will have the right to receive, for each such share, either (1) 0.375 New Square Shares or (2) 0.375 New Square CDIs. Where an Afterpay shareholder has a registered address in Australia or New Zealand, that shareholder is to receive New Square CDIs but may elect to receive New Square Shares. Where an Afterpay shareholder's address on the Afterpay register is located outside of Australia and New Zealand, that shareholder is to receive New Square Shares but may elect to receive New Square CDIs. Certain foreign Afterpay shareholders will be deemed ineligible to receive New Square Shares or New Square CDIs, and will instead have the shares or CHESS Depositary Interests to which they are entitled issued to a sale agent who will sell the securities and remit the sale proceeds (net of certain costs) to the relevant shareholders.

At any time prior to the lodgement of a draft of the Scheme Booklet with ASIC pursuant to Section 411(2) of the Australian Corporations Act, ***Square may elect to change the Scheme Consideration to consist of (1) either 0.37125 New Square Shares or New Square CDIs and (2) cash in an amount equal to 1% of the original Scheme Consideration in Australian dollars*** ("Cash Election"). If Square makes the Cash Election, the per share cash payment will be determined by the volume weighted average trading price of a share of Square Class A common stock on the NYSE over a to-be-determined five trading day period preceding the Implementation Date. ***Square does not expect to make the Cash Election***.

(Emphasis added).

94.     The Preliminary Proxy further promised: "No offer of securities shall be made in the United States absent registration under the U.S. Securities Act of 1933, as amended, or pursuant to an exemption from, or in a transaction not subject to, such registration requirements." The Preliminary Proxy added that "[t]he shares of Square Class A common stock to be issued in the Transaction (including the shares underlying the New Square CDIs) will be issued pursuant to an exemption from the registration requirements provided by Section 3(a)(10) of the Securities Act based on the approval of the Transaction by the Court." The statements in the Preliminary Proxy were repeated in a definitive proxy statement filed with the SEC on October 5, 2021.

95.     As detailed herein, the Block shares were never registered, and they do not qualify for exemption under § 3(a)(10) or otherwise.

96.     Section 3(a)(10) is strictly construed to protect against resort to the exemption in evasion of the registration requirements of the Securities Act. To guard against misuse of the exemption and thus guard against evasion of the strict registration requirement of the Securities Act, the SEC has specifically identified eight conditions that "must be met by an issuer before" the issuer or other sellers can rely upon the exemption provided in § 3(a)(10):

a)   The securities must be issued in exchange for securities, claims or property interests; they cannot be offered for cash.

b)   A court or authorized governmental entity must approve the fairness of the terms and conditions of the exchange.

c)   The reviewing court or authorized governmental entity must (1) find, before approving the transaction, that the terms and conditions of the exchange are fair to those who will be issued securities, and (2) be advised before the hearing that the issuer will rely upon the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the transaction.

d)   The court or authorized governmental entity must hold a hearing before approving the fairness of the terms and condition of the transaction.

e)   A governmental entity must be expressly authorized by law to hold the hearing, although it is not necessary that the law require the hearing.

f)   The fairness hearing must be open to everyone who is proposed to be issued securities in the proposed exchange.

g)   Adequate notice of the hearing must be given to all those persons.

h)   There cannot be any improper impediments to the appearance by those persons at the hearing.

*See, e.g.*, SEC Revised Staff Legal Bulletin No. 3 (October 20, 1999).

97.     The SEC and courts nationwide have held that where, as here, issuers and other sellers of unregistered securities have failed to ensure strict compliance with each of the enumerated conditions of § 3(a)(10) as promulgated in the foregoing SEC regulatory guidance, that failure renders the exemption under § 3(a)(10) unavailable and consequently any corresponding offers or sales of unregistered securities in violation of § 5. And because the § 5 regime lays the burden of establishing complete compliance with any purported exemption exclusively on a party selling unregistered securities, it imposes strict liability for any non-exempt

offers or sales of unregistered securities made regardless of any fault or good faith on the part of the seller, regardless of whether purported fairness hearing has already occurred, and regardless of whether the fairness of the transaction has been ostensibly approved by the reviewing court.

98.     The SEC and courts nationwide have also held that the § 3(a)(10) exemption is not available where, as here, information relevant to either the transaction's fairness or the preconditions of the exemption itself are misrepresented, withheld, or otherwise not disclosed in full to the court for considerations at the purported fairness hearing. Where, as here, important information has been misrepresented or withheld from the court for consideration at the fairness hearing, any ensuing offers or sales of unregistered securities pursuant to the consequently invalid § 3(a)(10) exchange are in violation of § 5.

99.     Defendants were required to register the newly issued Block shares, failed to ensure strict compliance with § 3(a)(10)'s mandatory preconditions, and affirmatively misrepresented and withheld an array of critical information from the NSW Court conducting the fairness hearing.

100.    These failures not only imposed improper impediments to investors' ability to attend and meaningfully participate in the NSW Court's fairness hearing, but deprived the NSW Court from receiving and considering a host of serious concerns and objections to the Acquisition. Consequently, the offer and sale of unregistered Block shares pursuant to the Acquisition were non-exempt and thus in violation of § 5 of the Securities Act.

101.    As alleged in the Securities Action, each defendant violated, or controlled an employee, agent, or other person who violated, §§ 12(a)(1), 12(a)(2), and 15 of the Securities Act.

***The Stock Repurchases***

102.    Throughout the Relevant Period, the Individual Defendants caused Block to initiate repurchases of its common stock that substantially damaged Block. In total, Block paid over $196.3 million to repurchase approximately 1,207,221 shares of its own common stock at artificially inflated prices.

103.    From November 2021 through March 2022, as set forth below and detailed in the

2021 10-K and the Quarterly Report on Form 10-Q the Company filed with the SEC on May 5, 2022 for the period ended March 31, 2022 (the "1Q22 10-Q"):

- Between November 1, 2021 and November 30, 2021, Block purchased 14,493 shares of its common stock for approximately $3,696,295 at an average price of $255.04 per share.
- Between December 1, 2021 and December 31, 2021, Block purchased 192 shares of its common stock for approximately $46,846 at an average price of $243.99 per share.
- Between January 1, 2022 and January 31, 2022, Block purchased 3,814 shares of its common stock for approximately $615,999 at an average price of $161.51 per share.
- Between February 1, 2022 and February 28, 2022, Block purchased 375,968 shares of its common stock for approximately $60,722,592 at an average price of $161.51 per share.
- Between March 1, 2022 and March 31, 2022, Block purchased 812,754 shares of its common stock for approximately $131,267,899 at an average price of $161.51 per share.

104.    The material decline in the Company's stock price following the disclosure of the Data Breach and Block's failure to adequately respond demonstrates that the stock repurchases authorized by the Individual Defendants were made at artificially inflated prices to the detriment of Block and its shareholders.

105.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the costs of defending itself in the Consumer Class Action and the Securities Action, exposure to potential class-wide liability, as well as additional losses, including reputational harm and loss of goodwill.

106.    Additionally, Defendant Ahuja engaged in insider trading by selling 8,214 shares of Block common stock at inflated prices for combined total proceeds in excess of $1,152,949 during the Relevant Period.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

107.    Plaintiff brings this action derivatively in the right and for the benefit of Block to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of

fiduciary duties by the Individual Defendants.

108.    Block is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

109.    Plaintiff is a current shareholder of Block and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

110.    Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. The Board is neither disinterested nor independent.

111.    At the time this action was filed, Block's Board consisted of Defendants Botha, Brooks, Carter, Deighton, Dorsey, Garutti, McKelvey, Meeker, Summers, and Walker (the "Director Defendants"), as well as non-party Sharon Rothstein. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below. There is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the eleven current directors of Block are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

112.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

113.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

114.    Each of the Director Defendants authorized and/or permitted the false statements

to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

115.    Each of the Director Defendants were required, but failed, to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations; (ii) effectively oversee the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over data security practices.

116.    Additionally, the Director Defendants violated, or controlled an employee, agent, or other person who violated, §§ 12(a)(1), 12(a)(2), and 15 of the Securities Act by causing the Company to engage in the unlawful sale of unregistered securities.

117.    Defendants Botha, Deighton, and Summers are not disinterested or independent, and therefore, are incapable of considering a demand because they serve as members of the Audit and Risk Committee and, pursuant to the Audit and Risk Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, risk exposure and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's data security and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Botha, Deighton, and Summers cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

118.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, *i.e.*, monies belonging to the stockholders of Block. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Block, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

119.    If there is no directors' and officers' liability insurance, then the directors will not cause Block to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

120.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**<u>COUNT I</u>**
**Against The Individual Defendants for Violations of § 10(b)**
**of the Exchange Act and Rule 10b-5**

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

123.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading. The Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Block by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Block.

124.     The Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Block common stock.

125.     The Individual Defendants acted with scienter because they: (a) knew that the public documents and statements issued or disseminated in the name of Block were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

126.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Block, their control over, and/or receipt and/or modification of Block's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Block, participated in the fraudulent scheme alleged herein.

127.     As a result of the foregoing, the market price of Block common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Block common stock in purchasing Block common stock at prices that were artificially inflated as

a result of these false and misleading statements.

128.    As a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act and Rule 10b-5 have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

**COUNT II**
**Against The Individual Defendants for Violations of §§ 12(a)(1)**
**and 5(a) and (c) of the Securities Act**

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    The Individual Defendants, individually and in concert, directly or indirectly, caused Block to make use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell unregistered Block shares, or to carry or cause such unregistered Block shares to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. The unregistered Block shares exchanged in the Acquisition are securities within the meaning of § 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and are subject to, and do not qualify for exemption from, the registration, prospectus, and other requirements of § 5 of the Securities Act, § 77e.

131.    No registration statement has been filed with the SEC or been in effect with respect to the Block shares issued by means of the Acquisition. By means of the conduct alleged herein, the Individual Defendants caused the Company to sell and solicit non-exempt, unregistered Block shares pursuant to and directly in the Acquisition exchange.

132.    By means of the conduct herein alleged, each Individual Defendant caused the Company to violate, or controlled an employee, agent, or other person who violated, §§ 12(a)(1) and 5(a) and (c) of the Securities Act.

133.     By reason of the conduct alleged herein, the Individual Defendants caused Block to violate §§ 12(a)(1) and 5(a) and (c) of the Securities Act. As a result, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. In addition, as a consequence of their breach of fiduciary duties, the Individual Defendants have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

134.     Plaintiff on behalf of Block has no adequate remedy at law.

**COUNT III**
**Against The Individual Defendants for Violations of § 12(a)(2)**
**of the Securities Act**

135.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.     By means of the defective offering materials for the Acquisition, which constituted a prospectus within the meaning of § 12(a)(2) of the Securities Act, each of the Individual Defendants authorized the promotion, solicitation and sale of Block shares to individuals during the Relevant Period.

137.     The offering materials for the Acquisition contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The Individual Defendants owed a duty to make a reasonable and diligent investigation of the statements contained in the offering materials to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Individual Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the offering materials as set forth above.

138.     By reason of the conduct alleged herein, the Individual Defendants caused Block to violate § 12(a)(2) of the Securities Act. As a result, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and

reputational harm. In addition, as a consequence of their breach of fiduciary duties, the Individual Defendants have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

139.     Plaintiff on behalf of Block has no adequate remedy at law.

## COUNT IV
### Against The Individual Defendants for Breach of Fiduciary Duty

140.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

142.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

143.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public, the Company's shareholders, and the Company's customers, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

144.     In breach of their fiduciary duties owed to Block, the Individual Defendants willfully or recklessly caused the Company to engage in improper cybersecurity practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose to investors that: (i) the Company lacked adequate protocols restricting access to customer sensitive information; (ii) as a result, a former employee was able carry out the Data Breach by downloading certain Cash App reports containing full customer

names and brokerage account numbers, as well as brokerage portfolio value, brokerage portfolio holdings and/or stock trading activity; (iii) as a result, the Company was reasonably likely to suffer significant damage, including reputational harm; and (4) as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

145.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

146.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while Defendant Ahuja engaged in lucrative insider sales.

147.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Block's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

148.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

149.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

150.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action and Consumer Class Action and exposing the Company to millions of dollars in potential class-wide damages, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

### COUNT V
**Against Individual Defendant Ahuja for**
**Breach of Fiduciary Duties and Disgorgement**

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    By her wrongful acts, violations of law, and false and misleading statements and omissions of material fact that she made and/or caused to be made, Individual Defendant Ahuja was unjustly enriched at the expense of, and to the detriment of, the Company.

153.    Individual Defendant Ahuja had access to non-public information regarding the Company.

154.    Individual Defendant Ahuja is a fiduciary of the Company, possessed material, non-public information of the Company, and used that information improperly in selling Company stock because she was motivated, in whole or in part, by the substance of that material, non-public information, and acted with scienter.

155.    Individual Defendant Ahuja profited from the misconduct and the exploitation of material and adverse inside information.

156.    The other Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation

or other payments that were unjust in light of Defendants' bad faith conduct.

157.    Plaintiff, as the representative of the Company, seeks disgorgement of all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Individual Defendant Ahuja as a result of her wrongful conduct and breaches of fiduciary duties.

## COUNT VI
### Against The Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

160.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

161.    Plaintiff on behalf of Block has no adequate remedy at law.

## COUNT VII
### Against The Individual Defendants for Unjust Enrichment

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Block.

164.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Block that was tied to the performance or artificially inflated valuation of Block, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

165.    Plaintiff, as a shareholder and a representative of Block, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

166.    Plaintiff on behalf of Block has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the

Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 21, 2023

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:     /s/ Rachele R. Byrd
BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
TIMOTHY J. MACFALL
VINCENT A. LICATA
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
tjm@rl-legal.com
Email: vl@rl-legal.com

**ROSCA SCARLATO LLC**
ALAN ROSCA

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
-40-

2000 Auburn Drive, Suite 200
Beachwood, OH 44122
Telephone: (216) 570-0097
arosca@rscounsel.law

29209

## <u>VERIFICATION</u>

I, Kevin LaLone, am a plaintiff in this action.  I have reviewed the allegations made in the Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: Feb 3, 2023

Kevin LaLone (Feb 3, 2023 15:19 EST)

[Stockholder Name]